1
2
3
4
5
6
7

8      UNITED STATES  DISTRICT COURT

9      Northern District of California

10      San Francisco Division

11    JEFFREY WILENS,                              No. 3:14-cv-02419-LB

12                        Plaintiff(s),            **ORDER DIRECTING THE CLERK
                                                   OF THE COURT TO REASSIGN THIS
13           v.                                    ACTION**

14    AUTOMATTIC INC,                              **REPORT AND RECOMMENDATION**

15                        Defendant(s).
      _____/

16                                    **INTRODUCTION**

17           Plaintiff Jeffrey Wilens – an attorney who runs a law firm called Lakeshore Law Center – sued

18    Doe 1 for trademark infringement, cybersquatting, and defamation after Doe 1 registered domain

19    names with variants of "Jeffrey Wilens" and "Lakeshore Law" and thereafter allegedly defamed Mr.

20    Wilens and his firm on the websites with those domain names.  The complaint thus asserts violations

21    of the Lanham Act, 15 U.S.C. § 1125(a)(1), the Anticybersquatting Consumer Protection Act

22    ("ACPA"), 15 U.S.C. § 1125(d), and California tort law.  (*See* First Amended Complaint ("FAC"),

23    ECF No. 23.[1])  Mr. Wilens initially sued Automattic, Inc. ("Automattic"), Google, Inc. ("Google"),

24    and TLDS LLC ("TLDS") for their roles in hosting the websites, but he subsequently filed a first

25    amended complaint, dismissed all three entities, and proceeded against Doe 1 only.  He served Doe

26    1 with the first amended complaint and summons by email (after the undersigned allowed that

27    _____

28           [1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations
      are to the ECF-generated page numbers at the tops of the documents.

process), but Doe 1 failed to respond, and the clerk entered his default. Mr. Wilens now moves for default judgment against Doe 1. (Motion, ECF No. 58.) The court held a hearing on April 23, 2015. (4/23/15 Minute Order, ECF No. 63.)

Because Doe 1 has not appeared and thus has not consented to the undersigned's jurisdiction, *see* 28 U.S.C. § 636, the undersigned directs the Clerk of the Court to reassign this action to a district judge. Based on the record, the undersigned recommends that the district judge grant Mr. Wilens's motion and (1) enter default judgment in his favor on the ACPA and defamation claims, (2) award statutory damages on the ACPA claim of $20,000 and costs of $1,404, and (3) order injunctive relief on the ACPA claim, including transfer or cancellation of domain names containing the marks JEFFREY WILENS or LAKESHORE LAW CENTER.

## STATEMENT

## I. MR. WILENS'S ALLEGATIONS

Plaintiff Jeffrey Wilens is an attorney specializing in consumer and employment law. (FAC ¶¶ 1, 8, 11.) The name of his law firm is Lakeshore Law Center. (*Id.* ¶¶ 10-11.) He is the only attorney in the United States named Jeffrey Wilens, and there is only one law firm called Lakeshore Law Center. (*Id.* ¶ 11.) He maintains websites at www.lakeshorelaw.org and www.creditrepairdebt.org. (*Id.* ¶ 10.) He holds trademark rights in the marks JEFFREY WILENS and LAKESHORE LAW CENTER and has spent tens of thousands of dollars advertising and promoting his personal and business name. (*Id.* ¶¶ 9, 13.)

Mr. Wilens alleges that Doe 1 created accounts at three entities (Google, Automattic, and TLDS, all former Defendants, now dismissed) located in the Northern District of California and thereafter created seven websites that (1) violate Mr. Wilens's rights in the JEFFREY WILENS and LAKESHORE LAW CENTER marks and (2) tarnish and disparage him and his law practice. (*See id.* ¶¶ 14-20.) TLDS is the domain-name registrar for www.jeffreywilens.com. (*Id.* ¶¶ 16, 20.) Google hosts jeffreywilens.blogspot.com. (*Id.* ¶¶ 15, 19.) Automattic hosts lakeshorelawcenter.wordpress.com, attorneyjeffreywilens.wordpress.com, jeffreywilenslawyer.wordpress.com, unitedvictimsofjeffreywilens.wordpress.com, and jeffreywilenslakeshorelaw.wordpress.com. (*Id.* ¶¶ 14, 18.)

Mr. Wilens alleges that Doe 1 (the sole remaining Defendant) created the websites "for the purposes of diverting search engine traffic by clients and potential clients of [Mr. Wilens] from [Mr. Wilens's] websites controlled by" Doe 1, and that Doe 1 "did this for purposes of commercial gain and with intent to tarnish and disparage [Mr. Wilens's] marks by creating likelihood of confusion." (*Id.* ¶ 17.) He alleges trademark infringement by Doe 1's "using in commerce the terms or names 'Jeffrey Wilens' and/or 'Lakeshore Law Center' in a matter that is likely to cause confusion or to deceive as to the affiliation, connection, or association of the ownership of the aforementioned websites." (*Id.* ¶ 23.) Mr. Wilens alleges that because of these trademark infringements, he "suffered damages in that potential or actual clients have been misdirected to the offending websites by virtue of the fact they appear prominently in the list of websites generated by 'Googling' Jeffrey Wilens or Lakeshore Law Center. If Doe 1 had not been allowed to use the names 'Jeffrey Wilens' or 'Lakeshore Law Center' as the domain names, the search engines would not have ranked these offending websites so highly." (Id. ¶ 24 (emphasis in original).)

The complaint alleges that the websites criticize Mr. Wilens and his firm:

¶ 33: Doe 1 "stated that 'Jeffrey Wilens is engaging in the same activity that many lawyers, disbarred and/or jailed were engaging in.'"

¶ 34: "Attached to these statements [in paragraph 33] are articles about lawyers who committed various crimes. One attached example was an attorney named Noel Gage who was convicted of 18 felony charges including for bribing witnesses to give false testimony and conspiring to create false evidence against a business. Another example is attorney William S. Lerach, who was convicted for concealing payments to plaintiffs so they could buy stocks and be ready to sue companies for securities fraud when the company released negative news that harmed the stock price. Another example is Melvin Weiss who was convicted of conspiring to make secret payment to securities class action plaintiffs."

¶ 35: "These statements are objectively false because [Mr. Wilens] has not engaged in any criminal conduct remotely similar to that described. [Mr. Wilens] has not bribed witnesses or conspired to create false evidence. He did not conceal payments to individuals who were recruited to purchase stock so they would have standing to bring securities fraud lawsuits."

¶ 36: "Elsewhere on the Internet, Defendant [presumably Doe 1] stated [that] 'JEFFREY WILENS IS USING SAME TACTICS [sic] AS ATTORNEY'S [sic] WHO HAVE BEEN JAILED AND DISBARRED. Many lawyers using the same unethical tactics as Jeffrey Wilens and [sic] have been disbarred and jailed. Jeffrey Wilens [sic] unethical moves will catch up to him and he will be next to be disbarred.' The first example cited is the use of 'runners' (i.e., cappers) and describes what they do. The second example is an article about immigration lawyers who were charged with submitting fraudulent asylum applications."

¶ 37: "This is objectively false because [Mr. Wilens] does not employ cappers and he has not been involved in submitting any fraudulent applications to the government or the court."

¶ 38: Doe 1 "stated [that] 'Jeffrey Wilens gets the millions while his clients the "victims" get nothing.' This statement is objectively false. There has never been a lawsuit where Jeffrey Wilens was 'paid millions' and the class members or his individual client received nothing. This statement is not mere hyperbole as there have been class actions where lawyers reaped millions and the class members received no monetary compensation. However, [Mr. Wilens] has never prosecuted such a class action."

¶ 39: Doe 1 "stated [that] 'Jeffrey Wilens makes up victims for his baseless class action suit.' The gist of this statement seems to be that [Mr. Wilens] had a person falsely claim that he was a victim of a particular company's illegal conduct when in fact that person had no dealings with the company. This is objectively false as [Mr. Wilens] has never had someone falsely claim to be a victim in this manner. Put another way, in every lawsuit filed by [Mr. Wilens] he honestly and reasonably believed his client has the relationship with the defendant company that was described in the complaint."

¶ 40: Doe 1 "created and published a false review from supposedly an actual client" of Mr. Wilens, and the review stated that Mr. Wilens "contacted me and asked me to be a victim in one of his frivolous litigation against a major corporation. . . . Although this statement was posted on the Internet in October 2013 no such lawsuit has been filed against [Mr. Wilens]. Moreover, no such client exists. Put another way, [Mr. Wilens] never contacted anyone and asked him or her to be a victim in a frivolous lawsuit. In fact, Doe Defendant wrote this review himself or herself and made

1    up the proposed client."

2    ¶ 41: "The foregoing defamatory statements were published on the Internet in the last six to eight

3    months. Because [Doe 1] posted the information on websites that used the Jeffrey Wilens and

4    Lakeshore Law Center names, they came up high in Google ratings whenever someone was

5    searching for [Mr. Wilens]."

6    ¶ 42: "In the published statements Defendant admitted [that] his goal was to cause [Mr. Wilens]

7    to suffer 'agony,'" and the statements were made intentionally and maliciously with the intent to

8    cause pain and suffering and to "destroy [Mr. Wilens's] professional reputation and to cause him to

9    lose clients."

10   **II. ADDITIONAL INFORMATION RELEVANT TO RELIEF SOUGHT**

11   In addition to the seven websites mentioned in the first amended complaint, Mr. Wilens has

12   identified four other instances of Doe 1 using his marks and defaming him. In his motion for default

13   judgment and the declaration accompanying it, Mr. Wilens says that, after the institution of this

14   action, Doe 1 created a website at www.lakeshorelawcenter.com that contains the same content as

15   the website at www.jeffreywilens.com (which was mentioned in the first amended complaint).

16   (Motion, ECF No. 58 at 5; Wilens Decl., ¶ 7.) He also said he found a Facebook page and a Twitter

17   account that use his personal and law firm names, and he specifies that they contain offending

18   information repeated from the websites. (Motion, ECF No. 8 at 6; Wilens Decl. ¶ 11.) He attaches a

19   screenshot of the Twitter page, which is located at twitter.com/Jeffrey_Wilens. (ECF No. 58 at 57.)

20   It says, "This is not Jeffrey Wilens [sic] official account. This is a Fan Page. We are the victims of

21   Jeffrey Wilens." The account holder has tweeted links to the offending websites mentioned in the

22   first amended complaint. And in a supplemental declaration, Mr. Wilens says he found a website

23   located at jeffrey-wilens.blogspot.com which contains the same content as the websites mentioned in

24   the first amended complaint and which links to www.jeffreywilens.com. (Wilens Supp. Decl., ECF

25   No. 64 at 2 & Ex. 1.)

26   In the declaration accompanying his default-judgment motion, Mr. Wilens provides screenshots

27   of the following websites: (1) www.jeffreywilens.com; (2) www.lakeshorelawcenter.com;

28   (3) jeffreywilens.blogspot.com; (4) jeffreywilenslakeshorelaw.wordpress.com;

(5) jeffreywilenslawyer.wordpress.com; (6) lakeshorelawcenter.wordpress.com; and

(7) unitedvictimsofjeffreywilens.wordpress.com. (Wilens Decl., Exs. 1-7, ECF No. 58 at 25-56.) In

part, they are gripe sites that purport to be put up by Mr. Wilens's "victims" and contain complaints,

including those excerpted from the first amended complaint and summarized above.

Mr. Wilens reiterates in his declaration that many statements contained on the above-listed

websites are objectively false. (*Id.* ¶ 15.) He stresses that he has not committed crimes, he has not

filed groundless lawsuits with a corrupt or malicious intent to vex and annoy (and no judge has

found that he has), he had never been awarded millions in fees when his clients received nothing (or

anything even approximating this), he has never directed someone to make up being a duped

consumer or purchaser, and he never contacted anyone to ask him or her to be a victim in a frivolous

lawsuit. (*Id.*)

As described below, Mr. Wilens was able to identify emails associated with Doe 1. One email is

jeffypetrov@mail.ru. (*Id.* ¶ 15.) In June 2014, Mr. Wilens sent an email to this address complaining

about the trademark violations, and on July 16, 2014, Mr. Petrov responded. Mr. Wilens describes

the emails that he exchanged with Mr. Petrov as follows:

> . . . Mr. Petrov engaged me in a series of email communications, in which he
> defended the accuracy of contents of the websites and blogs and repeated many of the
> same defamatory statements. I told Petrov the websites and blogs were violating
> [my] trademarks and were defamatory and the pending trademark/defamation lawsuit
> was specifically discussed. Petrov stated on August 13, 2014: "Your lawsuit is
> baseless so go ahead and make our day and continue to fight it. We are only posting
> the truth." Over time, Mr. Petrov stated that he wanted me to dismiss one or more
> pending class actions that [I] was prosecuting. In exchange, Petrov said he would
> stop posting information about [me] and would transfer the domain name to [me].
> However, these discussions never went anywhere because Petrov would not
> specifically identify which class actions should be dismissed.

(*Id.*) Mr. Wilens then says Mr. Petrov described the lawsuits in sufficient detail that Mr. Wilens was

able to narrow down the possible lawsuits "to a handful involving two or three different (and

unrelated) defendants." (*Id.* ¶ 17.) He says, "All of those lawsuits are meritorious and I think it

likely that the defendants in those actions, one of which is almost certainly Doe here, would benefit

substantially if the class action is dismissed, saving many hundreds of thousands or even millions of

dollars in financial liability to the plaintiffs and class members (and their attorney)." (*Id.* ¶ 18.) Mr.

Petrov sent Mr. Wilens at least 20 emails between July 16, 2014 and December 20, 2014. (*Id.* ¶ 20.)

As to the harm that Doe 1's acts have caused, Mr. Wilens points to the effect on his practice. He has a specialized practice in consumer and employment law, and it is not unusual for him to receive inquiries from potential clients throughout the United States. (*Id.* ¶ 6.) In the last twenty years he has spent tens of thousands of dollars advertising and promoting his personal and business name. (*Id.*) Doe 1's acts affect "Google search engine traffic so that searches for 'Jeffrey Wilens' or 'Lakeshore Law Center' usually turned up one of Doe [1]'s websites or blogs on the first page of listings." (*Id.* ¶ 13.) (Mr. Wilens represented at the April 23, 2015 hearing that www.jeffreywilens.com (with its accusations of his criminal conduct) is the first hit on a Google search of his name.) "As a result, [he] believe[s] that a number of clients or potential clients interested in reaching the real Jeffrey Wilens of the Lakeshore Law Center were diverted to Doe [1]'s websites and Blogs." (*Id.*) He elaborates:

> At one point in time, at least half of the page 1 Google search results for ["]Jeffrey Wilens["] or ["]Lakeshore Law Center["] were to the offending websites and blogs. Many members of my family, friends and colleagues have commented on the postings. Several clients and potential clients mistakenly end[ed] up at the fake websites/blogs rather than my official one and I had to explain to him that [there is] a sick coward out there trying to defame me.

(*Id.* ¶ 21.) Mr. Wilens has spent more than 100 hours of his time trying to address the harm that Doe 1 caused, and but for Doe 1's actions, Mr. Wilens would have spent this time on his practice. (*Id.* ¶ 20.) Besides the reputational harm he suffered from defamatory statements and the search hits, since December 2013, he has suffered emotional and mental distress arising from the harm to his reputation. (*Id.* ¶ 21.)

In a supplemental declaration, Mr. Wilens declared that his normal hourly rate is $650. (Wilens Supp. Decl., ECF No. 64, ¶ 5.) He has 30 years of legal experience. (*Id.*) He notes that many of his cases that he handled on appeal (and usually in the trial court as well) resulted in published opinions, and he lists 19 of them. (*Id.* ¶ 7.) He notes a recent 2013 case where an Orange County superior court judge awarded him his $650 hourly rate. (*Id.* ¶ 8 (citing *Davis v. Citibank, N.A.*, Orange County Superior Court, Case No. 30-2008-00060145).) In a second supplemental declaration, Mr. Wilens stated that, of the time he has spent on this action, 65% was for investigation, 15% was for legal research, 5% was for drafting and filing the two complaints, 5% was for drafting and filing

1    oppositions to the motions to dismiss, and 10% was for drafting and filing documents related to the

2    motion for default judgment. (Wilens Second Supp. Decl., ECF No. 66, ¶¶ 2-3.)

3        Mr. Wilens's costs are $1,404: $400 for initial filing fees; subpoena fees of $788; and service

4    fees for chambers copies of $216. (Wilens Decl., ECF No. 58, ¶ 5.)

5    **III. PROCEDURAL HISTORY**

6        **A. The Complaint and Dismissed Defendants**

7        Mr. Wilens filed his complaint on May 25, 2014. (Complaint, ECF No. 1.) On July 1, 2014,

8    after TLDS filed a motion to dismiss, Mr. Wilens filed a first amended complaint that dropped

9    TLDS from the action. (FAC, ECF No. 23; 7/3/2014 Order, ECF No. 26.) In his first amended

10   complaint, Mr. Wilens brought claims against Automattic, Google, and Doe 1 for trademark

11   infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), and cybersquatting in violation

12   of the ACPA, 15 U.S.C. § 1125(d). (*Id.* ¶¶ 7-30.) He also brought a claim against Doe 1 for

13   defamation. (*Id.* ¶¶ 31-43.) Following their joint motion to dismiss, Mr. Wilens dismissed

14   Automattic and Google, leaving only Doe 1 as a defendant. (7/31/2014 Stipulation, ECF No. 31;

15   9/10/2014 Notice, ECF No. 35.)

16       **B. Doe 1: Attempts to Identify and Subsequent Service By Email**

17       Mr. Wilens thereafter sought, and the court granted, leave to serve Doe 1 by email. Mr. Wilens's

18   efforts to identify Doe 1 are summarized in the court's order at ECF No 53, and some of the

19   pertinent facts are as follows:

20   •   TLDS identified the registrar listed for jeffreywilens.com as Konstantin Petrov with an address

21       purportedly (but probably not actually) in St. Petersburg, Russia and with an email of

22       jeffypetrov@mail.ru.

23   •   Mr. Wilens wrote an email complaining about the violations to jeffypetrov@mail.ru, and the

24       person responded and defended and repeated the accusations. The person also asked for an

25       unspecified class action to be dismissed and in return offered to stop posting and return the

26       domain names.

27   •   Doe 1 also switched the registrar from TLDS to Enom.com, which lists the registrant as

28       "Anonymous Speech," a company that conceals the identities of emailers. Its email is

1    abuse@enom.com.

2    •   Another email address identified through Google was johnytroll2@gmail.com, which

3        corresponds to "Johnny Troll," the listed owner of jeffreywilens.blogspot.com.

4    •   Automattic did not have names associated for the wordpress.com sites, but it had an affiliated

5        email of johnnytroll2@mail.ru.

6    (2/5/15 Order, ECF No. 53, at 4-8.) The bottom line that the undersigned reached was that Doe 1

7    used anonymizing tools to conceal his identity but the emails provide a means of communicating

8    with him. The court allowed service by email to all of the email addresses above. (*Id.*) On

9    February 10, 2015, Mr. Wilens filed proof that he served Doe 1 by email on February 5, 2015 and

10   also tried to post notice on the websites. (Proof of Service, ECF No. 54.) He was able to post a

11   comment on jeffreywilens.blogspot.com, received a notice that his comment was "awaiting

12   moderation" on the jeffreywilens.com website, and was unable to post on the wordpress.com sites

13   because they had been taken down. (*Id.* at 2.) For each, he received a message that "[t]his site has

14   been archived or suspended." (*Id.*) As described above, ultimately Mr. Wilens was able to

15   communicate with Doe 1.

16   **C. The Motion for Default Judgment**

17       Doe 1 never responded to the first amended complaint, so upon Mr. Wilens's request, the Clerk

18   of the Court entered Doe 1's default. (Entry of Default, ECF No. 57.) Then, on March 15, 2015, Mr.

19   Wilens filed his motion asking the court to enter default judgment against Doe 1. (Motion, ECF No.

20   58.) The court directed Mr. Wilens to serve Doe 1 with the motion by email.[2] (3/16/15 Order, ECF

21   No. 59.) Mr. Wilens then filed his proof of service. (Proof of Service, ECF No. 60.) Doe 1 did not

22   

23       [2] Notice is required only when a party has appeared. But the court ordered service because
24   authority suggests that notice may be required when there is some contact with a defaulting party
     who manifests some indication of an intent to defend the suit. (*See* 3/16/15 Order, ECF No. 59
25   (citing *In re Roxford Foods, Inc.*, 12 F.3d 875, 880 (9th Cir. 1993) ("While it is true that '[t]he
     failure to provide 55(b)(2) notice, if the notice is required, is a serious procedural irregularity that
26   usually justifies setting aside a default judgment or reversing for the failure to do so,' *Wilson*, 564
     F.2d at 369, notice is only required where the party has made an appearance. 'The appearance need
27   not necessarily be a formal one, i.e., one involving a submission or presentation to the court. In
     limited situations, informal contacts between the parties have sufficed when the party in default has
28   thereby demonstrated a clear purpose to defend the suit.' *Id.*")).)

oppose the motion, appear, or ask to appear at the April 23, 2015 hearing.  (4/23/2015 Minute Order, ECF No. 63.)

### D. Mr. Wilens's Requested Relief

The complaint asks for the following relief:

> 1.   For a permanent injunction enjoining Defendants from misusing Plaintiff's trademarks or service marks and cancellation of domain names and/or transfer of them to Plaintiff;
>
> 2.   For actual damages on the first and second causes of action in an amount according to proof;
>
> 3.   For statutory damages of $100,000 for each domain name that was misused as alleged above on the second cause of action;
>
> 4. For general and special damages on the third cause of action;
>
> 5. For interest on the sum of money awarded as damages;
>
> 6. For costs of suit incurred herein; and
>
> 7. For such other and further relief as the court may deem proper.

(FAC, ECF No. 23 at 10.)

In his motion, Mr. Wilens asks for $100,000 in damages and proposes two alternative ways of achieving them. The first is statutory damages of $100,000 under the ACPA based on $50,000 apiece for the "two infringing domain names" of "Jeffrey Wilens" and "Lakeshore Law Center," by which Mr. Wilens means to say, the two marks—JEFFREY WILENS and LAKESHORE LAW CENTER— that Doe 1 used in the domain names of the offending websites.[3]  (Motion, ECF No. 58 at 15.)

The second is actual damages of $100,000 on the defamation claim based on "general damages in the nature of emotional distress and mental suffering."  (*Id.* at 15-16.)  And he asks for equitable

---

[3] Technically, the domain names are the individual websites (e.g., jeffreywilens.blogspot.com or lawshorelawcenter.wordpress.com) and not the marks (e.g., Jeffrey Wilens or Lakeshore Law Center). *See Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687 (6th Cir. 2003) ("Domain names consist of a second-level domain—simply a term or series of terms (e.g., a2zsolutions)—followed by a top-level domain, many of which describe the nature of the enterprise. . . .  A website's domain name (e.g., a2zsolutions.com) signifies its source of origin and is, therefore, an important signal to Internet users who are seeking to locate web resources.").

injunctive relief "as the court may deem reasonable" including forfeiture and cancellation of the domain names www.jeffreywilens.com and www.lakeshorelawcenter.com or transfer of the domain names to him.  (*Id.* at 16.)  He asks for an injunction to prevent future misappropriation of his marks under the ACPA.  (*Id.*)

His proposed order specifies his requested relief as follows:

First, the domain names www.jeffreywilens.com and www.lakeshorelawcenter.com should be transferred to him.  (Proposed Order, ECF No. 58-1 at 5.)

Second, the following blogs should be transferred to him (*id.*):

    a. lakeshorelawcenter.wordpress.com.

    b. attorneyjeffreywilens.wordpress.com.

    c. jeffreywilenslawyer.wordpress.com.

    d. united victimesofjeffreywilens.wordpress.com.

    e. jeffreywilenslakeshorelaw.wordpress.com.

    f. jeffreywilens.blogspot.com

Third, the Twitter profile @Jeffrey_Wilens, which is located at twitter.com/Jeffrey_Wilens, should be transferred to him.  (*Id.*)

Fourth, he asks for damages of $100,000 and costs of $1,404.  (*Id.*)

At the hearing, Mr. Wilens said that not all the websites currently are "live."  The point of the injunctive relief, though, is to prevent Doe 1 from continued serial cybersquatting with Mr. Wilens's protected marks. Thus, Mr. Wilens also asks that the injunctive relief specify the Twitter profile and an additional domain name that Mr. Wilens identified at the hearing and documented in a supplemental declaration: a Google Blogger website located at jeffrey-wilens.blogspot.com.  (Wilens Supp. Decl., ECF No. 64, ¶ 3, & Ex. 1.)  That website says that Jeffrey Wilens and Lakeshore Law Center engaged in the same practices as the convicted Melvin Weiss and posts a news feed about the Weiss conviction and 30-month sentence.  (*Id.*)

## ANALYSIS

## I.  THE COURT HAS JURISDICTION OVER THIS MATTER AND DEFENDANT

Before entering default judgment, a court must determine whether it has jurisdiction over

1    defendants. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

2       **A. Jurisdiction and Service**

3       Before entering default judgment, the court must have subject-matter jurisdiction over the case

4    and personal jurisdiction over Doe 1. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). The court

5    also must ensure the adequacy of service. *See Timbuktu Educ. v. Alkaraween Islamic Bookstore*,

6    No. C 06-03025 JSW, 2007 WL 1544790, at *2 (N.D. Cal. May 25, 2007).

7          *1. Subject-Matter Jurisdiction*

8       Mr. Wilens alleges that Doe 1 has violated the Lanham Act and the ACPA. The court has

9    subject-matter jurisdiction over these federal claims and supplemental jurisdiction over the

10   defamation claim. *See* 28 U.S.C. § 1331(a).

11         *2. Personal Jurisdiction*

12      California's long-arm statute authorizes specific personal jurisdiction over nonresident

13   defendants to the full extent permitted by the Due Process Clause of the United States Constitution.

14   *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-801 (9th Cir. 2004).  To establish

15   specific personal jurisdiction in the forum state, the court applies the following three-prong test:

16            1.  The non-resident defendant must purposefully direct his activities or consummate
                 some transaction with the forum or resident thereof; or perform some act by which he
17               purposefully avails himself of the privilege of conducting activities in the forum . . . ;

18            2.  The claim must be one which arises out of or relates to the defendant's
                 forum-related activities; and
19
              3.  The exercise of jurisdiction must comport with fair play and substantial justice,
20               i.e. it must be reasonable.

21   *Id.* at 802.  "The plaintiff bears the burden of satisfying the first two prongs of [this] test." *Id.*  The

22   burden then shifts to defendants to present a compelling case that the exercise of jurisdiction would

23   be unreasonable.  *Id.*

24         *a. Purposeful Direction*

25      The first prong requires a defendant to either purposefully avail itself of the privilege of

26   conducting business activities within the forum or purposefully direct activities toward the forum.

27   *See Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  Tort claims—including

28   the ACPA claim—are analyzed under the purposeful direction test. *See Craigslist, Inc. v. Kerbel*,

No. C 11-3309 EMC, 2012 WL 3166798, at * 4 (N.D. Cal. Aug. 2, 2012). Purposeful direction exists when a defendant commits an act outside the forum state that was intended to and does in fact cause injury within the forum state. *Calder v. Jones*, 465 U.S. 783, 788-89 (1984). Under the *Calder* "effects" test, the defendant must (1) commit an intentional act (2) expressly aimed at the forum state (3) that causes "harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Id.* (citation omitted).

As to the intentional act requirement, the defendant must perform an act with the intent to perform an actual, physical act; he need not have the intent to accomplish a result or consequence of the act. *Id.* Mr. Wilens alleged sufficiently that Doe 1 committed a purposeful act by operating a website that posted statements about Mr. Wilens. *See Rio Props, Inc. v. Rion Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) (operating a website was an intentional act); *eADGEAR, Inc. dba www.eadgear.com v. Liu*, No. C 11-05398 JCS, 2012 WL 2367805, at *6 (N.D. Cal. June 21, 2012).

As to the express aiming requirement, conduct expressly aimed at the forum state must be something more than mere foreseeability. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010). Express aiming exists "when a defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *CollegeSource, Inc. v. Academyone, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (internal quotations and citations omitted). Here, Doe 1 used Mr. Wilens's marks on websites and made statements targeted at Mr. Wilens, known to Doe 1 as an attorney who practices in California, and also allegedly used the infringing domain names to divert Internet users attempting to reach Mr. Wilens's sites. This constitutes conduct aimed at Mr. Wilens in this forum. *See CollegeSource*, 653 F.3d at 1077; *Facebook, Inc. v. Banana Ads LLC*, No. C 11-03619-YGR (KAW), 2013 WL 1873289, at * 5 (N.D. Cal. Apr. 30, 2013), *adopted*, 10/24/13 Order, ECF No. 210.

As to the foreseeable-harm-in-the-forum-state requirement, it requires that the defendant's intentional acts have foreseeable effects in the forum. *Brayton*, 606 F.3d at 1131. Here, it was foreseeable that Doe 1's negative statements about Mr. Wilens and his law practice would cause harm to Mr. Wilens in California. *See eADGEAR*, 2012 WL 23667805, at * 7.

*b. Arising From Forum-Related Activities*

For a claim to arise out of or relate to a defendant's forum-related activities, it must be a result of but-for causation: but for the defendant's acts, a plaintiff is not injured. *See Ballard*, 65 F.3d at 1495. Here, Mr. Wilens alleged sufficiently that Doe 1 expressly targeted him, and he suffered injury from that targeting, in this forum. *See Facebook*, 2012 WL 1873289, at *5.

*c. Reasonableness*

This prong of the test for specific jurisdiction provides that the exercise of jurisdiction must comport with fair play and substantial justice. *Panavision*, 141 F.3d at 1320. To determine whether the exercise of jurisdiction over a non-resident defendant comports with fair play and substantial justice, a court considers seven factors: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *Core-vent Corp. v. Nobel Indus.*, 11 F.3d 1482, 1487-88 (9th Cir. 1993).

There is a presumption of reasonableness when the first two prongs have been met, and a defendant must present a "compelling case" that jurisdiction is unreasonable. *Schwarzenegger*, 374 F.3d at 802. Here, the defaulting Doe 1 targeted Mr. Wilens in California with acts that impugned Mr. Wilens's his integrity and law practice in California. The court concludes that exercising specific personal jurisdiction over Doe 1 is reasonable and comports with traditional notions of fair play and substantial justice.

*3. Adequate Service*

As recounted above, (1) the court permitted Mr. Wilens to serve Doe 1 by email, (2) Mr. Wilens served Doe 1 with the complaint, summons, and motion for default judgment by email, and (3) Doe 1 has had ongoing email communications with Mr. Wilens. (2/5/2015 Order, ECF No. 53; Proof of Service, ECF No. 54; Proof of Service, ECF No. 60.) The court finds that Doe 1 was adequately served and has notice of the action and motion.

UNITED STATES DISTRICT COURT
For the Northern District of California

## II. THE *EITEL* FACTORS AND ENTRY OF DEFAULT JUDGMENT

Under Federal Rule of Civil Procedure 55(b)(2), a plaintiff may apply to the district court for – and the court may grant – a default judgment against a defendant who has failed to plead or otherwise defend an action. *See Draper v. Coombs*, 792 F.2d 915, 925 (9th Cir. 1986). After entry of default, well-pleaded allegations in the complaint regarding liability and entry of default are taken as true, except as to damages. *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). The court is not required to make detailed findings of fact. *Id.* Default judgment cannot exceed the amount demanded in the pleadings. Fed. R. Civ. P. 54(c).

"A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment," *Draper*, 792 F.2d at 924-25; that decision lies within the court's discretion, *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002). Default judgments generally are disfavored because "cases should be decided on their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). In deciding whether to enter a default judgment, the court should consider: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute about the material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel*, 782 F.2d at 1471-72.

### A. Default Judgment

#### 1. Merits of the Plaintiff's Substantive Claims and Sufficiency of the Complaint

Taken together, the second and third *Eitel* factors essentially require that "a plaintiff state a claim on which [it] may recover." *Pepsico*, 238 F. Supp. 2d at 1175. Mr. Wilens brings three claims against Doe 1: one for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), one for cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d), and one for defamation. The court addresses each in turn below.

##### a. Trademark Infringement in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)

In his first claim, Mr. Wilens alleges that Doe 1 is liable for "trademark infringement" in violation of Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1). (FAC ¶¶ 7-25.)

"The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (quoting 15 U.S.C. § 1127). "To this end, section 43(a) of the Act, 15 U.S.C. § 1125(a), proscribes 'the use of false designations of origin, false descriptions, and false representations in the advertizing and sale of goods and services.'" *Sleep Science Partners v. Lieberman*, No. 09–04200 CW, 2010 WL 1881770, at *2 (N.D. Cal. May 10, 2010) (quoting *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1036 (9th Cir. 2005)). Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), states in pertinent part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a)(1) has two prongs: subsection (A) covers trademark infringement and false designation of origin claims, while subjection (B) covers false advertising claims. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990-91 (9th Cir. 2008) (stating that the first prong of Section 43(a)(1)(A) "concerns false designation of origin" and referring to Section 43(a)(1)(B) as "the false advertising prong"); *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007) (distinguishing between these two prongs of Section 43(a)(1) of the Lanham Act). Mr. Wilens alleges that "Defendants violated 15 U.S.C. § 1125, subdivision (a)(1) by using in commerce the terms or names 'Jeffrey Wilens' and/or 'Lakeshore Law Center' in a manner that is likely to cause confusion or to deceive as to the affiliation, connection or association of the ownership of the aforementioned websites." (FAC ¶ 23.) This language parrots the language of Section 43(a)(1)(A),

15 U.S.C. § 1125(a)(1)(A), and thus Mr. Wilens brings his claim under that subsection, and not under Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

To establish a claim for trademark infringement or false designation of origin under Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A), a plaintiff must prove that the defendant (1) used in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. *See Freecycle*, 505 F.3d at 902; *see also Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980) (claims under Section 43(a)(1)(A) of the Lanham Act for trademark infringement, false designation of origin, or unfair competition may be proven by the same elements as common-law unfair competition, and the federal prohibitions on trademark infringement and false designation of origin each "preclude the use of another's trademark in a manner likely to confuse the public about the origin of goods") (citing *New West Corp. v. NYM Co. of California Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation [under Section 43(a)(1)(A)] infringement, unfair competition or false designation of origin, the test is identical[:] [I]s there a 'likelihood of confusion?'")).

Mr. Wilens alleges that he (1) is an attorney specializing in consumer and employment law and the name of his law firm is Lakeshore Law Center, (2) is the only attorney in the United States with his and his law firm's name, (3) maintains websites at www.lakeshorelaw.org and www.creditrepairdebt.org, and (4) holds trademark rights in the marks JEFFREY WILENS and LAKESHORE LAW CENTER and has spent tens of thousands of dollars advertising and promoting his personal and business name. (FAC, ECF No. 23 ¶¶ 1, 8-13.) He also alleges that Doe 1 created seven websites that violate his rights in the JEFFREY WILENS and LAKESHORE LAW CENTER marks and tarnish and disparage Mr. Wilens and his law practice. (*Id.* ¶¶ 14-20.) Mr. Wilens further alleges that Doe 1 created the websites "for the purposes of diverting search engine traffic by clients and potential clients of [Mr. Wilens] from [Mr. Wilens's] websites controlled by" Doe 1, and that Doe 1 "did this for purposes of commercial gain and with intent to tarnish and disparage [Mr. Wilens's] marks by creating likelihood of confusion." (*Id.* ¶ 17.)

The court accepts Mr. Wilens's non-damages-related allegations as true, as it must, and they generally establish the elements of the claim. At the April 23, 2015 hearing, the court discussed with Mr. Wilens its concern about the allegation that Doe 1 did this for purpose of "commercial gain," which is an element of the claim. On default judgment, an issue is whether this allegation is sufficient given that the allegations about the website, as pled and made manifest through Exhibits 1 through 7, show that they are gripe sites, which in turn implicates the issue of whether they were created and displayed for the noncommercial purpose of criticizing Mr. Wilens.

Under the Ninth Circuit's holding in *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 674 (9th Cir. 2005), "the noncommercial use of a trademark as the domain name of a website—the subject of which is consumer commentary about the products and services represented by the mark—does not constitute infringement under the Lanham Act." Mr. Wilens addressed this issue in his opposition to Automattic's earlier motion to dismiss. There, he argued that it is not known yet whether Doe 1's use of the marks was made in connection with the sale of goods or services, so his allegations of commercial use are sufficient at this stage of the proceedings. (*See* Opposition, ECF No. 30 at 6-7.) He also points specifically to his allegation that Doe 1 created the websites "for the purposes of diverting search engine traffic by clients and potential clients of [Mr. Wilens] from [Mr. Wilens's] websites controlled by" Doe 1, and that Doe 1 "did this for purposes of commercial gain and with intent to tarnish and disparage [Mr. Wilens's] marks by creating likelihood of confusion." (FAC ¶ 17.) He then posits that "it is quite possible that [Doe 1] is a competitor [to him] or acting on behalf of a competitor and not a former client." (Opposition, ECF No. 30 at 6.) He also says that "Defendants may argue [that] the websites do not seem to contain any links to [Doe 1's] own website, but it is possible that [Doe 1] reaches out to visitors by email or through the blogs' message boards. . . . While public comments seem to have been disabled[,] that does not mean there have been no private communications." (*Id.*)

These may be fair points, and the court appreciates Mr. Wilens's arguments, especially as amplified at the hearing. But there is a good argument that on the face of this complaint, the allegations of commercial use are at best about the monetary interests of Doe 1 (discussed in the next section as sufficient for the ACPA's requirement of "bad-faith attempt to profit") and not about

commercial gain.  For example, the allegations do not say that Doe 1 uses the websites to solicit legal business (thereby taking Mr. Wilens's clients) or includes links to or advertisements for goods or services for sale.  *Cf. Bosley*, 403 F.3d at 678 (noting that the defendant's website contained no commercial links).  To the extent that Doe 1's websites harm Mr. Wilens's business, this is a result of Doe 1's criticisms.  That Mr. Wilens's business may be hurt by Doe 1's criticisms does not turn that criticism into a commercial use.  *See id.* at 678-79 (rejecting the argument that the Lanham Act's commercial use requirement is satisfied because the defendant's use of the plaintiff's mark as the domain name may deter customers from reaching the plaintiff's site itself).  Again, the court's view is that the allegations are enough for the ACPA claim and not necessarily so for the trademark claim.

*Bosley* was decided upon an appeal from the district court's summary-judgment ruling, but a claim alleging that consumer criticism of the plaintiff mark owner constitutes trademark infringement may be subject to dismissal at the pleadings stage where the plaintiff does not sufficiently allege that the defendant used the marks in connection with the sale of any goods or services.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 540-41 (D.C. Cir. 2013) (affirming the district court's dismissal with prejudice of the plaintiffs' trademark infringement claim where the plaintiffs alleged only that the defendant was their competitor generally and did not allege facts showing that the marks were used in connection with the sale of any goods or services); *Stanislaus Custodial Deputy Sheriffs' Ass'n v. Deputy Sheriff's Ass'n of Stanislaus County*, No. CV F 09-1988 LJO SMS, 2010 WL 843131, at *6-7 (E.D. Cal. Mar. 10, 2010) (district court dismissed without prejudice the plaintiff's trademark infringement claim where the plaintiff failed to allege the commercial use of the trade name); *Cleary Bldg. Corp. v. David A. Dame, Inc.*, 674 F. Supp. 2d 1257, 1267-68 (D. Colo. 2009) (district court dismissed with prejudice the plaintiff's trademark infringement claim where the defendant's website, which contained the plaintiff's marks, did not link to any advertisements and the plaintiff did not allege that the defendant otherwise used the marks in connection with the sale of any goods or services).

The court recognizes that default judgment in part turns on notice to the defaulting defendant, and notice was given here.  Mr. Wilens made the point that he has robust allegations about the

conduct in his first amended complaint, and he argues that is enough. But the court's view is that

the first amended complaint's non-conclusory allegations point to the marks being used in

noncommercial manners in the domain names of "gripe sites," and that they thus fall within the

ruling in *Bosley*. Also, default judgment, in the end, always remains a discretionary call given the

preference for deciding claims on the merits. *See Draper*, 792 F.2d at 124-25; *Eitel*, 782 F.2d at

1472; *Pepsi-Co*, 238 F. Supp. 2d at 1175.

At the April 23, 2015 hearing, Mr. Wilens, while not willing to concede the issue of commercial

use, said essentially that he was not opposed to the court's practical solution that it made the most

sense to proceed on the ACPA and defamation claims at the default-judgment stage, especially given

that the ACPA claim provides for the same statutory damages, and both claims together capture the

conduct here. Thus, the recommendation below is for default judgment only on the two other

claims.

### b. Cybersquatting in Violation of the ACPA, 15 U.S.C. § 1125(d)

In his second claim, Mr. Wilens alleges that Doe 1 is liable for a cybersquatting violation under

the ACPA, 15 U.S.C. § 1125(d). "Cybersquatting" is the bad-faith registration of a domain name

that is identical or confusingly similar to another's distinctive mark. 15 U.S.C. § 1125(d)(1)(A).

The ACPA states that

> A person shall be liable in a civil action by the owner of a mark, including a personal
> name which is protected as a mark under this section, if, without regard to the goods
> or services of the parties, that person
>
> > (I) has a bad faith intent to profit from that mark, including a personal name
> > which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that—
> >
> > > (I) in the case of a mark that is distinctive at the time of registration of the
> > > domain name, is identical or confusingly similar to that mark;
> > >
> > > (II) in the case of a famous mark that is famous at the time of registration of
> > > the domain name, is identical or confusingly similar to or dilutive of that
> > > mark; or
> > >
> > > (III) is a trademark, word, or name protected by reason of section 706 of Title
> > > 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

In determining whether there is a likelihood of confusion under the ACPA, courts compare the plaintiff's mark with the name of the website. *See eADGEAR*, 2012 WL 2367805, at *13 (citing *Coca-Cola v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004) (likelihood of confusion with websites that had names such as www.my-washingtonpost.com, www.mymcdonalds.com, and www.drinkcoke.org)). A court does not look beyond the domain name to consider the content of the website, and thus the inquiry under the ACPA is narrower than the traditional multifactor likelihood-of-confusion test for trademark infringement. *Purdy*, 382 F.3d at 783. Consequently, even though it might be evident from the content of a website that it is not affiliated with a plaintiff, there nonetheless may be a violation of the ACPA. *Id.* By contrast, if the domain name makes it clear that it is not affiliated with the plaintiff, then there is no ACPA violation. *eADGEAR*, 2012 WL 2357805, at *13 (collecting cases and examples such as www.taubmansucks.com or www.ballysucks.com).

The ACPA does not contain a commercial use requirement, in contrast to Lanham Act trademark infringement, which does. *See Bosley*, 403 F.3d at 680. It does contain the requirement of a "bad faith attempt to profit." 15 U.S.C. § 1125(d)(1)(A)(I).

> In determining whether a person has a bad faith intent . . . a court may consider such factors as but not limited to–
>
> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(I).

On the other hand, "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

Mr. Wilens alleges that he holds trademark rights in the marks JEFFREY WILENS and LAKESHORE LAW CENTER and that "Defendants registered, trafficked in and used domain names incorporating the personal and business names of [Mr. Wilens], which are distinctive marks, and with the bad faith intent to profit from those marks." (FAC ¶¶ 9, 27.) He also alleges that Doe 1 "provided false contact information when applying to register the domain names and Defendants knowingly published that false information," and that Doe 1 "registered or set up multiple websites with domain names Defendants knew were identical or confusingly similar to the marks of [Mr. Wilens] and Defendants permitted him to do this." (*Id.* ¶ 28.) He elaborates on this motivation in his declaration regarding the motives of Doe 1 to possibly gain a monetary advantage by trading domain names for ending litigation possibly against them. His investigation reveals that Doe 1 registered the domains. *See* 15 U.S.C. § 1125(d)(1)(D) ("A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.")

Accepting Mr. Wilens's non-damages allegations as true, and considering the allegations about the domains, the court finds that he sufficiently alleges a claim for cybersquatting under the ACPA. In particular, as to the bad-faith intent to profit, Mr. Wilens alleges facts sufficiently. He has trademark rights in the marks JEFFREY WILENS and LAKESHORE LAW CENTER, and those

marks, which also are his and his law firm's names, are used in the domains of the offending websites. *Id.* § 1124(d)(B)(i)(I-II). Doe I offered to basically transfer the domain names back for financial gain, he presented misleading registrant information (e.g., Johnny Troll), and he registered multiple domain names that he knew were identical to or confusingly similar to Mr. Wilens's marks. *Id.* § 1124(d)(B)(i)(VI-VII). The gripe sites seem plausibly related to disgruntlement about litigation and possibly an attempt to shut it down, which suggests that Doe 1 is motivated by personal financial considerations. These allegations are sufficient at the default-judgment stage to plead a bad-faith attempt to profit.

### c. Defamation

In his third claim, Mr. Wilens alleges that Doe 1 is liable for defaming him. To sustain a cause of action for defamation, a plaintiff must demonstrate "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Ringler Assocs. Inc. v. Md. Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (Cal. Ct. App. 2000). "Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." *Id.* at 1179 (citing *Cunningham v. Simpson*, 1 Cal. 3d 301, 306 (1969)).

The charge of a crime is defamatory on its face. *See Boyich v. Howell*, 221 Cal. App. 2d 801, 802 (Cal. Ct. App. 1963). Defamation also can result from a charge that a plaintiff is guilty of an act of dishonesty or has some defect of character that reflects on the person's integrity as to bring him into disrepute. *Slaughter v. Friedman*, 32 Cal. 3d 149, 153-54 (1982) (charge that public official had religious and racial prejudice). Falsely charging a person with a violation of confidence reposed in him or with treachery to his associates also is actionable per se. *Dethlefsen v. Stull*, 86 Cal. App. 2d 499, 402 (Cal. Ct. App. 1948).

One potential issue is the First Amendment. The First Amendment protects the right to anonymous speech. *Art of Living Found. v. Does 1-10*, No. 10-5022, 2011 WL 5444622, *3 (N.D. Cal. Nov. 9, 2011) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)). That right is not absolute. *Id.* at *4. Some of the case law cited here is in the context of discovery of the identity of Doe defendants, but it provides a useful frame of reference. After all, when third-parties

providers such as Twitter or Google receive subpoenas to produce identifying information of defendants like Doe 1, the court applies the standard to ensure that the appropriate First Amendment standard is considered and that a defendant's right to anonymous speech is protected. *See Music Group Macao Comm'l Offshore Limited v. Does*, No. 14-mc-80328, 2015 WL 930249 (N.D. Cal. Mar. 2, 2015). In the context of default judgment for alleged defamation on gripe sites, the situation is not just about notice pleading and service on a defaulting defendant. It necessarily implicates whether the allegations establish a claim at all because some speech is protected by the First Amendment. The analysis turns on what the speech is. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1174-77 (9th Cir. 2011) (the Ninth Circuit's review of the developing tests in the area of anonymous online speech).

Of the various approaches that *Anonymous Online Speakers* discussed, one is the test enunciated in *Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005). "In choosing the proper standard to apply, the district court should focus on the 'nature' of the [defendant's] speech . . . ." *Art of Living*, 2011 WL 5444622 at *5 (citing *Anonymous Online Speakers*, 661 F.3d at 1177 ("[T]he nature of the speech should be a driving force in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes.") and *SI03, Inc. v. Bodybuilding.com, LLC*, 441 F. Appx. 431, 431-32 (9th Cir. 2011) (same)). The most protected realm is "political, religious, or literary" discourse; "commercial speech" enjoys "lesser" protection; but may be more safeguarded than pure "fighting words and obscenity," which is "not protected by the First Amendment at all." *See Anonymous Online Speakers*, 661 F.3d at 1173, 1175-76; *Art of Living*, 2011 WL 5444622 at *5.

As Mr. Wilens said at the hearing, there is much in the challenged gripe sites that is merely offensive, not defamatory, and amounts to protected griping. And some speech could be seen as commercial criticism of Mr. Wilens's business practices, which may be protected commercial speech. *See Highfields*, 385 F. Supp. at 975 (noting protected nature of sardonic commentary about a public corporation through irony and parody). These can be views that a defendant has a right to express, anonymously, and might be subject to the *Highfields* approach of assessing and comparing "the magnitude of the harms that would be caused to the [plaintiff's and defendant's] competing

interests." But as Mr. Wilens points out, here there also are defamatory statements that "caused real harm" to him, particularly given how high they figure in the Google hits and the resulting reputational issues for Mr. Wilens's law practice. *See Highfields*, 385 F. Supp. 2d at 975-76.

The allegations summarized above, and shown by Exhibits 1 through 8, essentially accuse Mr. Wilens of engaging in the same conduct of convicted criminals who also are lawyers and who were disbarred. The statements are defamatory per se. The statements are not one-time pieces of snideness. *Cf. Music Group Macao Comm'l Offshore Limited v. Does*, No. 14mc80328, 2015 WL 930249, at *4 (N.D. Cal. Mar. 2, 2015). Instead, Mr. Wilens pleads a campaign against him with defamatory accusations that tarnish and disparage him and hurt his law practice. (*See* FAC ¶¶ 14-21, 33-40.) He also alleges that Doe 1 "admitted [that] his goal was to cause [Mr. Wilens] to suffer 'agony,'" and the statements were made intentionally and maliciously with the intent to cause pain and suffering and to "destroy [Mr. Wilens's] professional reputation and to cause him to lose clients." (*Id.* ¶ 42.)

It is true that Mr. Wilens's investigation reveals that the comments are from a single disgruntled person. But that insight is not shown by the sites, which purport to contain comments from Mr. Wilens's victims. The comments are not legitimate criticism, they are not parody, they are not joking, and they are not ironic. *Cf. Music Group Macao*, 2015 WL 930249, at *4-*5. Accepting Mr. Wilens's non-damages-related allegations as true, the court finds that he sufficiently alleges a claim for defamation.

### 2. The Remaining Eitel Factors Also Favor Entering Default Judgment

The remaining *Eitel* factors weigh in favor of granting default judgment.

#### a. The Possibility of Prejudice to Mr. Wilens

If the motion is not granted, Mr. Wilens has no recourse: (1) Doe 1 appears to reside outside of the United States; (2) Mr. Wilens's attempt to require Automattic and Google to take down the websites did not succeed in removing all sites; and (3) Doe 1's serial sites using Mr. Wilens's protected marks presents an ACPA moving target.

#### b. The Possibility of a Dispute Concerning a Material Fact

Doe 1 never answered Mr. Wilens's first amended complaint, so there is no information

1 demonstrating that there is a disputed issue of material fact. The record reveals no disputed facts.

2     ***c. Excusable Neglect***

3   There is no suggestion of excusable neglect.

4     ***d. The Sum of Money at Stake in the Action***

5     When the money at stake in the litigation is substantial or unreasonable, default judgment is

6 discouraged. *See Eitel*, 782 F.2d at 1472 (three-million-dollar judgment, considered in light of

7 parties' dispute as to material facts, supported decision not to enter default judgment); *Tragni v.*

8 *Southern Elec. Inc.*, No. 09-32 JF, 2009 WL 3052635, at *5 (N.D. Cal. Sept. 22, 2009); *Board of*

9 *Trustees*, 2010 WL 145097 at *3 (citing *Eitel*, 782 F.2d at 1472). But when the sum of money at

10 stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate.

11 *Board of Trustees of the Sheet Metal Workers Health Care Plan v. Superhall Mechanical, Inc.*, 2011

12 WL 2600898 at *2 (the sum of money for unpaid contributions, liquidated damages, and attorneys

13 fees were appropriate as they were supported by adequate evidence provided by plaintiffs).

14     Mr. Wilens seeks $100,000 in damages, $1,404 in costs, and injunctive relief including

15 cancellation or transfer to him of the infringing domain names. The damages sought are within the

16 statutory amounts, the costs are low, and the injunctive relief is allowed under the ACPA. This

17 factor does not disfavor entry of default judgment in this case. (The discretionary determination of

18 the amount of damages is discussed below.)

19     ***e. The Strong Policy in the Federal Rules Favoring Decisions on the Merits***

20     Despite the policy of favoring decisions on the merits, default judgment is appropriate when a

21 defendant refuses to litigate a case. Fed. R. Civ. P. 55(b); *see Board of Trustees v. RBS Washington*

22 *Blvd, LLC*, No. C 09-00660 WHA, 2010 WL 145097, *4 (N.D. Cal. Jan. 8, 2010). This factor favors

23 entry of default judgment in this case for all of the reasons summarized above and that boil down to,

24 Doe 1 is a serial ACPA violator with Mr. Wilens's mark.

25 **III. RECOMMENDATION FOR ENTRY OF DEFAULT JUDGMENT**

26     In his motion, Mr. Wilens seeks $100,000 in damages (either statutory or actual), $1,404 in

27 litigation costs, and injunctive relief that includes a cancellation or transfer to him of the domain

28 names alleged in the complaint and the newly identified Twitter profile @Jeffrey_Wilens and

domain name www.jeffrey-wilens.blogspot.com.

Preliminarily, the Twitter profile @Jeffrey_Wilens is a profile on a social media site and which is located at twitter.com/Jeffrey_Wilens. The ACPA says nothing about social media profiles, and the mark JEFFREY WILENS is found within the post-domain name path, and not the domain name itself, for twitter.com/Jeffrey_Wilens. *See Interactive Prods. Corp.*, 326 F.3d at 691, 696-97 (explaining that "[e]ach web page within a website has a corresponding uniform resource locator ('URL') (e.g., a2zsolutions.com/ desks/floor/laptraveler/dkfl-lt.htm), which consists of a domain name and a post-domain path" and that "[a] post-domain path (e.g., /desks/floor/laptraveler/dkfl-lt.htm) merely shows how a website's data is organized within the host computer's files" and thus "does not typically signify source"); *see also* 15 U.S.C. § 1127 ("The term 'domain name' means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet."); S. Rep. No. 106-140, at 9 (1999) (ACPA legislative history indicates that the narrow definition of "domain name" includes only the alphanumeric designations located immediately to the left of the ".com," ".net," ".edu," and ".org" generic top-level domains). For this reason, any injunctive relief cannot be extended to it. (The court notes that at the hearing, Mr. Wilens said that a court order regarding Doe 1's acts regarding him would have utility to Mr. Wilens if he needs to address ongoing conduct by Doe 1.)

Under Federal Rule of Civil Procedure 54(c), "[a] default judgment may not differ in kind from, or exceed in amount, from what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The purpose of this rule is to ensure that a defendant is put on notice of the damages being sought against him so that he may make a calculated decision about how best to respond. *See In Re Ferrell*, 539 F.3d 1196 1192-93 (9th Cir 2008). "[E]ven a defaulting party is entitled to have its opponent produce some evidence to support an award of damages." *LG Elecs., Inc. v. Advance Creative Computer*, 212 F. Supp. 1171, 1178 (N.D. Cal. 2002).

**A. Equitable/Injunctive Relief Including Transfer of the Domain Names**

"In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the

domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). Injunctive relief is authorized under 15 U.S.C. § 1116(a) to prevent violations under § 1125. Generally, "injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). In particular, the ACPA gives courts the power to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). In light of Doe 1's operation of the seven offending websites that were mentioned in the first amended complaint, and Doe's 1 refusal to desist from doing so even after learning of Mr. Wilens's action, the court finds that transfer of those domain names is appropriate. *See Ploom, Inc. v. Iploom*, LLC, No. 13-cv-05813 SC, 2014 WL 1942218 at *8 (N.D. Cal. May 12, 2014) (concluding that transfer of the domain name was appropriate in light of the defendant's intentional misuse of the domain at [the plaintiff's] expense); *Starcom Mediavest Grp., Inc. v. Mediavestw.com*, No. 10-CV-04025-LHK, 2011 WL 332831, at *2 (N.D. Cal. Jan. 31, 2011) ("Considering the Registrant's ongoing violation of the ACPA, the Court concludes that permanent injunctive relief is appropriate with respect to the 'mediavestw.com' domain name.").

Subsequent to the filing of the first amended complaint, Mr. Wilens identified two other websites (lakeshorelawcenter.com and jeffrey-wilens.blogspot.com) that are subject to and violate the ACPA. Mr. Wilens asks for cancellation or transfer to him of these and essentially asks to enjoin serial cybersquatting by Doe 1 in violation of the ACPA.

One issue is that under Federal Rule of Civil Procedure 54(c), a default judgment "may not differ in kind from, or exceed in amount, from what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The reason is fair notice to the defendant so that he may make a calculated decision about how best to respond. *See In Re Ferrell*, 539 F.3d at 1192-93. The court does not see this as a concern in the context of transfer of enjoining the identified new website. The first amended complaint gives fair notice of the injunctive relief sought, defined not just as the websites in the complaint but more specifically as Doe 1's conduct. It also gives notice that Mr. Wilens seeks to enjoin Doe 1 from using domain names using his marks JEFFREY WILENS or LAKESHORE LAW CENTER (or variations thereof) in violation of the ACPA. And the new websites feature the same allegations about the

convicted lawyer with the 30-month sentence and otherwise link to Doe 1's other websites. The analogy is not perfect, but in the ERISA context, a complaint can give fair notice that a plaintiff sought post-filing contributions from an identified defendant even though the amounts were not specified in the complaint. *Board of Trustees of the Sheet Metal Workers Local 104 Health Care Plan v. Total AirBalance Co.*, No. 08-2038 SC, 2009 WL 1704677, at *3-5 (N.D. Cal. June 17, 2009). Mr. Wilens's first amended complaint likewise put Doe 1 on notice that he sought to enjoin Doe 1 from creating domain names using Mr. Wilens's marks in violation of the ACPA.

Another issue is the enforcement of a judgment against Doe 1. Doe 1 is not a "fictitious" Doe who needs to be identified and served: Mr. Wilens "identified" Doe 1, and he served him. At least as to the injunctive relief, the injunction is effective: it results in the transfer of the identified sites to Mr. Wilens, and Mr. Wilens can use the order to cut off Doe 1's serial ACPA violations. Mr. Wilens pointed out at the hearing is without a court order, he cannot shut down the sites easily. And it would cost money if Mr. Wilens had to file an in rem ACPA case every time he identified a new cybersquatting by Doe 1. *See* 15 U.S.C. § 1125(d)(2)(A). Moreover, the in rem remedy exists only when the owner of the mark cannot obtain jurisdiction or find the putative defendant:

> The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if--
>
> > (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c) of this section; and
> >
> > (ii) the court finds that the owner–
> >
> > > (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
> > >
> > > (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by–
> > >
> > > > (aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
> > > >
> > > > (bb) publishing notice of the action as the court may direct promptly after filing the action.

15 U.S.C. § 1125(d)(2)(A). The statutory scheme allows the precise process here.

1    In sum, the court recommends the requested injunctive relief, minus the Twitter account.

2    **B. Damages**

3    Mr. Wilens seeks statutory damages for the ACPA violations and, alternatively, actual damages

4    based on his defamation claim. He seeks a total of $100,000 under either theory. Doe 1 is on notice

5    of this amount because Mr. Wilens pled it in his first amended complaint.

6    Looking at the actual damages, Mr. Wilens seeks "general damages in the nature of emotional

7    distress and mental suffering." (Motion, ECF No. 58 at 15-16.) Mr. Wilens declares:

8        Since I discovered the offending websites and blogs in approximately December
         2013, I have suffered emotional and mental distress arising from the harm to my
9        reputation caused by the scurrilous lies found on these websites and blogs. At one
         point in time, at least half of the page 1 Google search results for Jeffrey Wilens or
10       Lakeshore Law Center were to the offending websites and blogs. Many members of
         my family, friends and colleagues have commented on the postings. Several clients
11       and potential clients mistakenly end up at the fake websites/blogs rather than my
         official one and I had to explain to [them] that [there was] a sick coward out there
12       trying to defame me. I am asking for $100,000 in general damages arising from [Doe
         1's] wrongdoing, but those can be included with the total damages of $100,000 that is
13       being sought.

14   (Wilens Decl., ECF No. 58, ¶ 21.)

15   While a court must accept a plaintiff's allegations as true when considering a motion for default

16   judgment, a court does not accept as true a plaintiff's allegations regarding damages; the plaintiff

17   retains the burden to prove damages. In this case, Mr. Wilens declares that he suffered emotional

18   distress and experienced embarrassment, but he does not quantify this distress and embarrassment

19   except to say that it is worth $100,000. He did not point the court to other default-judgment awards

20   that quantify emotional distress in similar situations involving harm to reputation, especially of a

21   lawyer. Mr. Wilens pointed out at the hearing that by definition, the assessment of damages is a

22   discretionary determination – whether by the trier of fact or by the court when it assesses damages at

23   the default-judgment stage – that involves someone's personal circumstances. And he pointed to his

24   own testimony provided in his declaration and made manifest in his recounting of his travails at the

25   hearing. Those are fair points, but as the court said at the hearing, there requires some proving up,

26   and courts are used to considering equivalent awards, especially at the default-judgment stage.

27   Mr. Wilens also says that clients and potential clients went to Doe 1's websites, but at least those

28   clients and potential clients contacted him (and after they did, he explained what the websites were

UNITED STATES DISTRICT COURT
For the Northern District of California

to them).  He does not submit any assessment of what pecuniary harm that he may have suffered

through lost clients or work.  Again, the court appreciates that it is may be difficult to quantify, but

there are proxies to measure damages (such as insights into how one's business revenue looks over a

particular time period), and courts ground even statutory damages award in some real-world context.

Mr. Wilens also points to the Lanham Act as a basis for his damages.  Available remedies

include (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the

action. 15 U.S.C. § 1117(a).  In the alternative, a plaintiff may recover statutory damages of $1,000

to $100,000 per domain name, as the court deems just.  15 U.S.C. § 1117(d).  Mr. Wilens elects

statutory damages.

Where a plaintiff elects to recover statutory damages, the court has broad discretion as to the size

of the damages award.  *See Peer Int'l Corp v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir.

1990).  Often that discretionary award of statutory damages is grounded in some estimate of actual

damages: gain to the defendant or loss to the plaintiff.  *See Herman Miller, Inc. v. Alpha Design,*

*Inc.*, No. C 08-3437-WHA, 2009 WL 3429739, at *9 (N.D. Cal. Oct. 22, 2009) (citing *Sara Lee*

*Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999)).  Where a reasonable

estimate of actual damages is available, statutory damages awards can comparable to the estimated

actual damages.  *See, e.g., Chanel, Inc. v. Doan*, No. C 05-3484-VRW, 2007 WL 781976 (N.D. Cal.

Mar. 13, 2007) (awarding $127,701 for willful infringement of trademarked handbags based on

plaintiff's estimate of defendants' profits, which was lower than the court's estimate).

In trademark infringement cases involving the misuse of a mark, courts in this district award

statutory damages at the low end of the permissible range when there is minimal evidence of actual

and quantifiable damage.  *See, e.g, Microsoft Corp. v. Coppola*, No. C 06-06701 WHA, at *4 (May

24, 2007) (awarding plaintiff $2,000 – double the statutory minimum at the time – where plaintiff

established only that defendant distributed three counterfeit units of plaintiff's software and infringed

two trademarks); *Chanel, Inc. v. Lin*, No. C-09-04996 JCS, 2010 WL 2557503 (N.D. Cal. May 7,

2010) *report and recommendation adopted*, C 09-04996 SI, 2010 WL 2557561 (N.D. Cal. June 21,

2010) (lacking evidence of actual damages, the court awarded $456,000 based on the statutory

minimum of $1,000 per infringed  mark (19 marks) per type of goods sold (eight types – handbags,

wallets, belts, key chains, shoes and boots, jewelry, and watches), trebled to reflect willfulness).

To determine a reasonable amount of statutory damages, courts also "generally consider a number of factors . . . , including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter . . . and other behavior by the defendant evidencing an attitude of contempt towards the court of the proceedings." *Verizon California, Inc. v. Onlinenic, Inc.*, No. C 08–2832 JF (RS), 2009 WL 2706393, at *3 (N.D. Cal. Aug. 25, 2009). These considerations are captured in the bad-faith factors in 15 U.S.C. § 1125(d)(1)(B)(i), listed above. In the counterfeiting context, and in addition to grounding statutory damages in a defendant's estimated gain or a plaintiff's estimated loss, courts consider (1) the value of the mark, (2) the deterrent value to the defendant, (3) the deterrent value on others beside the defendant, (4) whether the conduct was innocent or wilful, and (5) the defendant's cooperation. *See, e.g., Coach, Inc. v. Diva Shoes*, No. C 10-5151-SC, 2011 WL 1483436, at *6 (N.D. Cal. April 19, 2011); *Chanel, Inc. v. Tshimanga*, No. C 07-3592-EMC, 2008 U.S. Dist. LEXIS 118783 at *34 (N.D. Cal. April 28, 2008).

The question then is what – in the exercise of the court's discretion – is the right outcome here. The court considered the following in making a recommendation.

The first is what Doe 1 did. Doe 1 is a serial violator of the ACPA who created and maintained the seven websites in the complaint and three more that Mr. Wilens identified later. The websites used Mr. Wilens's marks and contained statements defaming Mr. Wilens and his law practice. Some appear to have been temporarily or permanently deleted, but at least four remain (two from the complaint and two that Mr. Wilens identified later), even after Doe 1 learned about Mr. Wilens's lawsuit. (Wilens Decl., ECF No. 58, ¶ 12; *see also* 12/26/2014 Wilens Decl., ECF No. 45, ¶ 10; 2/3/2015 Wilens Decl., Ex. 2, ECF No. 52, at 10-31.) Of concern is that Doe 1 redirects search engine traffic so that an offending site is the number one hit in a Google search for Mr. Wilens's personal and business names, thereby affecting his business, potentially reducing business, and creating a need for ongoing explanation. (Wilens Decl., ECF No. 58 ¶ 12.) That may be difficult to quantify in the form of lost revenue, but it is an obvious economic harm nonetheless for a solo practitioner such as Mr. Wilens who has invested time and money building and promoting his

specialized practice. Mr. Wilens's distress was manifest in his declarations and at the hearing, and he invested work in this lawsuit, all to take down domain names that violate the ACPA.

The second is that this case involves Doe 1's speech. Most trademark, copyright, and ACPA cases are about a defendant's commercial gain and the victim plaintiff's resulting commercial loss. Those economic factors tend to drive statutory damages awards, and then the defendant's own bad intent and bad acts can increase the award. But in this case, as the court concluded in analyzing the trademark claim, Doe 1's acts were not demonstrably for his commercial gain. The First Amendment does not protect defamation, of course. But it is one thing to award equitable ACPA relief and another entirely to impose a money penalty that might deter or chill speech by others, who might fear that they risk a substantial ACPA penalty.

The third and related consideration is Doe 1's statements (or speech) were about a lawyer. And while defamation is not protected speech, it may matter in the damages analysis that it is online griping plus defamation about a lawyer. The court after all looks at the "nature" of the speech, and that arguably contemplates more than just trying to evaluate where the speech falls on the continuum of protected speech to defamation, especially when protected griping is implicated. *See Anonymous Online Speakers*, 661 F.3d at 1177. Some might argue that it comes with the territory when disgruntled clients criticize lawyers. That is not to detract from Mr. Wilens's plight. Any case is about an individual plaintiff, and this case involves Mr. Wilens, not Mr. Wilens as a proxy for all lawyers. For this lawyer, Doe 1's acts diverted search engine traffic by clients and potential clients, presumably the only people who would google Mr. Wilens, and Doe 1 did so effectively in that Doe 1's websites are top hits from a Google search. (FAC ¶ 17.) Mr. Wilens is a solo practitioner who put time and money into building his practice, and Doe 1 disrupts that. That personal and professional context matters. One could posit a well-known figure who enjoys universal, obvious acclaim, and the diverted traffic might not matter so much. Mr. Wilens showed that it did here. Of course a prospective client would react to the websites when they are the top hits on a Google search.

The fourth consideration is the number of domain names. The court in *Banana Ads* used this as a factor, holding that the more domain names, the more malicious the conduct. *See* 2013 WL

1873289, at *16 (assessing a base statutory damages award of $5,000 per domain for defendants

registering fewer than 10 domains, $10,000 per domain for 10 to 19 domains, $15,000 per domain

for 20 to 29 domains, $20,000 domains for 30 to 39 domains, and $25,000 per domain for 40 to 49

domains). *Banana Ads* again is a commercial case about defendants diverting Facebook's customers

for their own commercial gain.

The fifth is an analysis of the bad-faith factor in 15 U.S.C. § 1125(d)(1)(B)(i)(V):

> (V) the person's intent to divert consumers from the mark owner's online location to a
> site accessible under the domain name that could harm the goodwill represented by
> the mark, either for commercial gain or with the intent to tarnish or disparage the
> mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation,
> or endorsement of the site.

The *Banana Ads* court used this factor to enhance the per-domain award by $5,000 per domain,

on the ground that it showed more egregious bad-faith conduct because the landing websites were

meant to deceive Facebook users into believing they were on Facebook's website, and the

defendants monetized the scheme by encouraging consumers to divulge personal information or buy

products. *See* 2013 WL 1873289, at *16. The court's view is that this factor's "likelihood of

confusion" is not a perfect fit here given the non-commercial nature of Doe 1's acts, but given that

the factors in 15 U.S.C. § 1125(d)(1)(B)(i) are not exhaustive, it is a relevant consideration.

The sixth consideration is Doe 1's attempt to conceal his identity, another factor that the *Banana

Ads* court used to enhance its per-domain damages award, albeit in a commercial context. *See id.*

The seventh consideration is the number of hours Mr. Wilens actually invested in this litigation,

which he declares is over 100 hours. Given that the court had a lengthy hearing, and Mr. Wilens

then submitted supplemental declarations after the hearing, the court assumes 105 hours, which is a

conservative estimate. 105 hours times Mr. Wilens's hourly rate of $660 results in a proxy for actual

damages of $69,300. Rounding it up (also a conservative approach given the record of Mr. Wilens's

efforts) makes it an even $70,000.

One concern about a fees-based approach is that Mr. Wilens spent at least some time responding

to Automattic's and Google's motion to dismiss. (*See* Opposition, ECF No. 30.) Most of Mr.

Wilens's time investment needed to be spent: the complaint would look the same with only Doe 1,

the case law is the same, and it is fair to spend time to evaluate who one ought to sue to stop ACPA

violations that affect one's business.  But once Google and Automattic filed their motion to dismiss ,

it was apparent that the claims against them failed, and one could discount the time Mr. Wilens spent

on his opposition.  The reason is that (1) the Lanham Act's commercial-use requirement doomed the

trademark claim (for the reasons stated above), (2) nothing suggests that Google or Automattic used

the marks because all they did was provide a platform where Doe 1 created the websites at issue, and

(3) there is no claim for direct cybersquatting against Google and Automattic because Doe 1

registered the names, and they only provided the platform.  *See* 15 U.S.C. § 1125(d)(1)(D);

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ("The

word 'registers,' when considered in context, obviously refers to a person who presents a domain

name for registration, not to the registrar.").  Mr. Wilens estimated in his supplemental declaration

that he spent about 5% of his time on the opposition at ECF No. 30. At best, that would reduce a

fees-based award to around $65,000.

Another concern about a fees approach is that not all of Mr. Wilens's time here (or perhaps any)

would be billed to new or existing clients.  After all, his practice required his attention regardless of

Doe 1's actions, and thus "lost fees" does not capture the harm to him.  Then again, this is an

approach to try to approximate the harm to Mr. Wilens.  Given the difficulty of quantifying

reputational harm and lost business, the court's view is the time Mr. Wilens spent is some

approximation of the harm to him.

The eighth consideration is Mr. Wilens's argument that statutory damages of $50,000 for two

websites (totaling $100,000) are reasonable.  And some awards are consistent with that amount.  *See

Ploom*, 2014 WL 1942218 at *7-8 (awarding $50,000 in statutory damages where the defendants

registered their domains with the intent to sell counterfeit Ploom products, repeatedly registered new

domains as Ploom discovered them, and consistently failed to respond to summons); *Wecosign, Inc.

v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012) (finding that a $50,000 statutory

damages award was appropriate where the defendants provided false contact information to the

domain name registrar); *Verizon California*, 2009 WL 2706393, at *3-6 (awarding $50,000 in

statutory damages for each violation where the defendant was a serial cybersquatter, engaged in

egregious conduct was egregious, tried to conceal its identity, and evaded service of process).  But

again, all of these cases, and indeed most of the default-judgment cases, involve only competitive harm and not speech.

The final consideration is the utility of a money judgment against Doe 1. Again, Doe 1 is not a "fictitious" Doe who needs to be identified and served: Mr. Wilens "identified" and served Doe 1, a real person who corresponds with Mr. Wilens via email and who uses pseudonyms (Johnny Troll) and possibly his real name (Petrov). The issues are only his true name and where he is. But as the court discussed with Mr. Wilens at the hearing, that does not translate into an enforceable judgment. Mr. Wilens responded that without a default judgment on the ACPA and defamation claims, providers such as Google are unwilling to cancel or transfer domain names (probably because of the First Amendment landscape described above). He acknowledged that of course one cannot enjoin defamation and can enjoin only the ACPA violations. He said that providers essentially would accept a court order with findings like those here about "the bad-faith intent to profit" element and apply it to Doe 1's future serial ACPA violations (if any). But without such an order, he likely would have to file serial ACPA and defamation complaints. He also said that he wanted and was entitled to his damages. And on some level, a refusal to award damages makes Doe 1 a winner. That, Mr. Wilens suggested, is an encouragement to continued bad behavior by someone who acted in bad faith. Finally, if Mr. Wilens ever identifies Doe 1's real name, he can try to enforce the judgment, and Doe 1 can try to set it aside.

All of these tensions can be reduced to these: (1) Doe 1's defamatory campaign against Mr. Wilens violated the ACPA and did not just involve griping because it hijacked the search engine traffic; (2) Mr. Wilens spent time and money trying to unwind the situation and experienced stress and perhaps professional loss because of it, and (3) this case is involves speech and thus differs from the ordinary case that involves a competitor's misuse of another's mark for profit. The court balanced these factors and recommends $10,000 each for the two marks used (JEFFREY WILENS and LAKESHORE LAW CENTER) for a total statutory-damages award of $20,000.

**B. Costs**

15 U.S.C. § 1117(a) allows for the recovery of litigation costs related to violations of the ACPA. Mr. Wilens spent $1,404 in litigation costs: $400 to file this action, $788 to serve the complaint,

summons, and several subpoenas, and $216 to deliver numerous chambers' copies of filed papers. (Wilens Decl., ¶ 5, ECF No. 58 at 18.)  The costs are reasonable.

## CONCLUSION

Because Doe 1 has not consented to or declined the court's jurisdiction, the court directs the Clerk of the Court to reassign this action to a district judge.  Based on the foregoing, the court recommends that the newly-assigned district judge grant Mr. Wilens's motion and (2) award him $20,000 in statutory damages and $1,404 in litigation costs, (2) enjoin Doe 1's cybersquatting on domains that contain the marks JEFFREY WILENS or LAKESHORE LAW CENTER, and (3) order cancellation or transfer to Mr. Wilens of the following domain names (and the court includes all of the names listed in the complaint for completeness, but some may have been taken down):

1. jeffreywilens.com

2. lakeshorelawcenter.com

3. jeffreywilens.blogspot.com

4. lakeshorelawcenter.wordpress.com

5. attorneyjeffreywilens.wordpress.com

6. jeffreywilenslawyer.wordpress.com

7. unitedvictimsofjeffreywilens.wordpress.com

8. jeffreywilenslakeshorelaw.wordpress.com.

9. jeffrey-wilens.blogspot.com

The court also directs Mr. Wilens to serve this report and recommendation on Doe 1 by email.

Any party may file objections to this Report and Recommendation with the district judge within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); N.D. Cal. Civ. L.R. 72.  Failure to file an objection may waive the right to review of the issue in the district court.

**IT IS SO ORDERED AND RECOMMENDED.**

Dated: April 28, 2015

LAUREL BEELER
United States Magistrate Judge